HORACE E. ALLEN AND KATHERINE M. ALLEN, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8354-74, 2373-75.    Filed May 24, 1976.

*Richard G. LaValley* and *John P. Stockwell,* for the petitioners.
*James E. Keeton, Jr.,* for the respondent.

---

[5] See also *William O. Hayden,* 52 T.C. 1112, 1126 n. 5 (1969), wherein we noted a similar distinction.

[1] Horace E. Allen and Katherine M. Allen, Charles D. Cobau and Edna N. Cobau, James G. Diller and Jean M. Diller, Edward L. Doermann and Norma Doermann, Harvey C. Gunderson and Marjorie Gunderson, Frederick B. Hawkins and Jane Hawkins, Robert C. Hawkins and Anita Hawkins, Harland F. Howe and Gratia Howe, Ward S. Jenkins and Elizabeth H. Jenkins, Thomas J. O'Grady and Inez M. O'Grady, Edward G. Seybold and Helen L. Seybold, John D. Skow and Lucile A. Skow, Daniel G. Tanner and Mathilda Tanner, and Robert E. Youngen and Jean Youngen filed a joint petition in docket No. 8354-74. Harvey C. Gunderson and Marjorie Gunderson, Howard A. Martin and Helen Martin, Spencer W. Northup and Virginia B. Northup, Kenneth Schoenrock and Boneta Schoenrock, Edward G. Seybold and Helen L. Seybold, Robert P. Sheon and Irma Sheon, Merl B. Smith and Margaret A. Smith, and Ernst Sternfeld and Zilli Sternfeld filed a joint petition in docket No. 2373-75. Both dockets were consolidated for trial, briefing, and opinion.

OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

|  | 1971 | 1972 |
|---|---|---|
| Horace E. and Katherine M. Allen | $108.22 | -- |
| Charles D. and Edna N. Cobau | 848.07 | -- |
| James G. and Jean M. Diller | 1,521.00 | -- |
| Edward L. and Norma Doermann | 5,412.79 | -- |
| Harvey C. and Marjorie Gunderson | 1,970.38 | $6,402.00 |
| Frederick B. and Jane Hawkins | 8,403.00 | -- |
| Robert C. and Anita Hawkins | 6,906.00 | -- |
| Harland F. and Gratia Howe | 1,004.31 | -- |
| Ward S. and Elizabeth H. Jenkins | 5,703.32 | -- |
| Thomas J. and Inez M. O'Grady | 570.00 | -- |
| Edward G. and Helen L. Seybold | 4,727.03 | 915.76 |
| John D. and Lucile A. Skow | 881.00 | -- |
| Daniel G. and Mathilda Tanner | 3,601.58 | -- |
| Robert E. and Jean Youngen | 202.58 | -- |
| Howard A. and Helen Martin | -- | 5,312.24 |
| Spencer W. and Virginia B. Northup | -- | 5,827.15 |
| Kenneth and Boneta Schoenrock | -- | 6,055.88 |
| Robert P. and Irma Sheon | -- | 1,057.25 |
| Merl B. and Margaret A. Smith | -- | 6,497.79 |
| Ernst and Zilli Sternfeld | -- | 8,094.86 |

The only issue to be decided is whether the petitioners' transfer of stock to a charitable organization constituted an anticipatory assignment of the proceeds of the liquidation of a corporation.

All of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners are 20 doctors and their wives. All resided in Toledo, Ohio, at the time the petitions were filed, except for Horace E. and Katherine M. Allen, who resided in Black Mountain, N.C., and Thomas J. and Inez M. O'Grady, who resided in Sylvania, Ohio. All of their returns for the years in issue were filed with the Internal Revenue Service in Cincinnati, Ohio. For convenience, the doctors are hereinafter referred to as petitioners.

Toledo Clinic Corp. (hereinafter referred to as TCC) is a for-profit Ohio corporation. Toledo Clinic, Inc., is an Ohio professional association engaged in the practice of medicine in Toledo. From October 1970 to the present, TCC has had one class of common stock issued and outstanding. Until December 21, 1971,

the 2,353 issued and outstanding shares of TCC were owned by petitioners, who were also associates in Toledo Clinic, Inc.

Until about October 1970, TCC was engaged in the business of owning and renting improved real estate and office and medical equipment and owning and operating an X-ray laboratory and pharmacy. Prior to October 1970, Toledo Clinic, Inc., was TCC's principal tenant. In that month, the association moved to new quarters, leaving most of TCC's buildings vacant. During 1970, TCC sold all of its tangible assets other than the real estate to Toledo Clinic, Inc., and others. After October 1970, the buildings were listed for sale with local real estate brokers. During 1971, some were rented to unrelated parties, including the Office of Economic Opportunity, but the majority of the space formerly rented to Toledo Clinic, Inc., remained unoccupied.

In April 1971, the petitioners considered liquidating TCC and amended its code of regulations to set the amount to be paid for the shares of a deceased shareholder at the ultimate liquidating value thereof. In June 1971, a plan of liquidation was adopted which, among other things, authorized the officers of TCC to sell or otherwise liquidate any and all of the properties to pay all debts and liabilities and distribute the remaining assets pro rata to the shareholders and specified that the complete liquidation and distribution of assets be commenced and completed as soon as practicable. Form 966 (Corporate Dissolution or Liquidation) was filed with respondent as required by section 6043.[2]

The Lucas County Board of Mental Retardation (hereinafter referred to as the board) is a governmental agency of the State of Ohio and is a public charity, contributions to which are deductible under section 170. Petitioners learned that the board was interested in purchasing or renting the real estate owned by TCC. On September 17, 1971, a meeting of TCC shareholders was informed of the board's interest, and a proposal for transferring the property to the board "by unanimous share-holder gifts of their stock to the donee" was considered. The minutes of the meeting recite that petitioners favored the donation "and were investigating the definitive manner in which it could be accomplished." The shareholders voted to seek a ruling from respondent on the tax effect of the proposed transaction.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.

After this meeting, three independent appraisals of the property were obtained. The value arrived at, together with the amount of cash retained from the earlier sale of other assets, resulted in a valuation of TCC's stock at approximately $320 per share. On October 4, 1971, the board approved the purchase of the real estate if offered. On November 19, 1971, the TCC stockholders met and discussed the appraisals, the tax consequences of the proposed donation, and the failure to obtain a ruling from respondent. They approved the transfer of 1,807 shares of TCC stock to the board as a charitable contribution, the redemption of the remaining 546 shares in their hands at a price of $320 per share, and the distribution of the remaining assets of TCC to the board in complete liquidation. Minutes of a special meeting of the board which also took place on November 19 contain the following:

> Mr. Shuer informed the Board that the "Toledo Clinic" property would be donated to the Board in the very near future. He further explained that the transaction would require an expenditure of approximately $12,000.00 plus the assumption of a $6,600.00 mortgage.
>
> Some of the buildings are presently leased to the Office of Economic Opportunity and other buildings are rented. Mr. Shuer explained that a board of directors may need to be formed and legal help obtained in order to complete the transaction.

The directors of TCC met on November 30, 1971. They approved the assumption of the outstanding mortgage on the buildings by the board and settled the details of the planned transaction. On December 6, 1971, the board held a meeting at which the following took place:

> Mr. Shuer and Mr. Wolson described the "Toledo Clinic" property that is being donated to the Board and some of the legal technicalities of its transfer to Board ownership.
>
> *Motion* by Mr. Lackey, * * * that the gift of stock of the Toledo Medical Clinic Corporation be accepted by the Board and that Mr. Shuer and Mr. Wolson be empowered to execute all documents necessary to effect the transfer.
>
> *Motion carried.*

On December 21, 1971, petitioners transferred a total of 1,807 shares of TCC stock to the board. A new stock certificate for those shares was issued to the board by the corporation. A vote of shareholders of TCC [3] approved these steps as well as the issuance

---

[3] The board signed the waiver of notice of the meeting, but the minutes do not indicate which shareholders were present either in person or by proxy.

of new certificates for the remaining 546 shares to petitioners and the redemption, effective the following day, of the latter shares at $320 per share. The directors and officers of TCC resigned, and new directors and officers were elected in their place. The new officers and a majority of the new directors were members or employees of the board. None of the petitioners was an officer or director.

On December 22, 1971, the shares of TCC held by petitioners were redeemed for cash at the agreed price. On December 23, 1971, the corporation conveyed the clinic property to the board by quitclaim deed.

Since December 22, 1971, TCC has continued to be a corporation validly existing and in good standing under the laws of Ohio and the board has been its sole shareholder. TCC has been inactive but has continued to file annual tax returns. It has received refunds based on carrybacks of 1971 and 1972 net operating losses. In 1972, it paid a deficiency determined with respect to its 1971 Ohio personal property tax return. At the time of trial, TCC had no liabilities and its only assets consisted of bank accounts totaling approximately $13,500 and an Ohio Industrial Commission deposit of approximately $560.

Richard G. LaValley, an attorney and co-counsel for petitioners herein, advised and represented TCC and its shareholders during the above transactions. He has been a director of TCC since December 21, 1971, and its assistant secretary since February 1972. Since December 22, 1971, he has had custody of TCC's bank accounts and records.

Upon examination of petitioners' returns for the years 1971 and 1972, respondent determined that petitioners had made anticipatory assignments of liquidating dividends equal to the fair market value of the TCC shares they transferred to the board,[4] resulting in realization of long-term capital gain equal to the difference between the amount of such proceeds and the basis of the shares. Consistently with this contention, he determined that the donated property was not "capital gain property" as defined in section 170(b)(1)(D), so that petitioners' contribution deduction was subject to a 50-percent rather than a 30-percent limitation. See sec. 170(b)(1)(A). Accordingly, he issued a notice

---

[4] Despite the fact that TCC apparently retained some liquid assets, the parties have treated the series of transactions as a complete liquidation, and we can give it no other characterization.

of deficiency in which he increased their 1971 capital gain incomes (in docket No. 8354-74) or reduced their 1972 capital loss or charitable contribution carryovers (in docket No. 2373-75). There is no dispute as to the fair market value of the shares transferred to the board nor as to the petitioners' cost basis in those shares.

Respondent's position is that the liquidation of TCC had proceeded to such a point at the time petitioners' shares of stock were transferred to the board that petitioners could not divest themselves of liability for the capital gain resulting from the subsequent redemption of those shares pursuant to the plan of complete liquidation. Petitioners counter with the assertion that the fact that the board obtained more than 75 percent of the outstanding shares of TCC (an amount sufficient to satisfy any and all voting conditions specified in TCC's code of regulations or under Ohio law) made the plan of complete liquidation rescindable by the board and, therefore, precludes respondent from taxing them on the capital gain on the redemption of the board's shares. In making this assertion, petitioners rely heavily on *Jacobs v. United States,* 390 F.2d 877 (6th Cir. 1968), affg. per curiam 280 F.Supp. 437 (S.D. Ohio 1966). Unfortunately for petitioners, *Jacobs* has recently been overruled by *Jones v. United States,* 531 F.2d 1343 (6th Cir. 1976, 37 AFTR 76-885, 76-1 USTC par. 9247). However, the fact that this particular judicial basis for petitioners' position has been destroyed does not relieve us of the obligation to deal with the substance of petitioners' contentions. To be sure, an appeal in this case will, with one exception,[5] be to the Sixth Circuit Court of Appeals, but we are constrained to note that the factual variations between this case and *Jones* are such that we do not consider the result in this case preordained. Cf. *Jack E. Golsen,* 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971). Nevertheless, for the reasons hereinafter stated, we hold for respondent.

The doctrinal framework within which the issue herein is posed consists of the admonition in *Gregory v. Helvering,* 293 U.S. 465, 469 (1935), that "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot

---

[5] An appeal in respect of petitioners Horace E. and Katherine M. Allen in docket No. 8354-74, who resided in North Carolina at the time of the filing of the petition, would lie to the Fourth Circuit Court of Appeals.

be doubted" and the instruction in *Helvering v. Horst,* 311 U.S. 112, 120 (1940), that "the purpose of the statute to tax the income to him who earns, or creates and enjoys it [cannot] be escaped by 'anticipatory arrangements however skilfully devised' [*Lucas v. Earl,* 281 U.S. 1·11 (1930)]."

The courts have applied these two principles in a variety of factual situations involving gifts of appreciated property and, in so doing, have at times utilized language which has created confusion and uncertainty as to whether the existence of the legal power to undo what had been done prior to the gift or the realities and substance of such prior action is the determinant for decision. Our own considered judgment is that the most recent pronouncement of the Sixth Circuit Court of Appeals that "the 'realities and substance' of the events and not hypothetical possibilities should govern" (see *Jones v. United States, supra)* offers the better standard. Moreover, this standard has in effect recently been applied by this Court in a situation where the involuntary act of death intervened and produced taxability to a decedent's estate under section 691. See *Estate of Harry B. Sidles,* 65 T.C. 873 (1976).

We recognize that our approach may revitalize the principles of *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), and *United States v. Cumberland Pub. Serv. Co.,* 338 U.S. 451 (1950), in an area not covered by the statutory antidote of section 337, thereby placing a premium on consulting one's lawyer early enough in the game. But, this has happened before (see *Waltham Netoco Theatres, Inc.,* 49 T.C. 399 (1968), affd. 401 F.2d 333 (1st Cir. 1968). We also realize that petitioners' suggested standard offers a clear-cut rule for decision which avoids the drawing of factual distinctions inherent in the rule we adopt. But, here again, the necessity of drawing lines is part of the daily grist of judicial life and should not influence us to adopt another rule simply to avoid difficulties in application. See *Estate of Lillie MacMunn Stewart,* 52 T.C. 830, 836 (1969), revd. on other grounds 436 F.2d 1281 (3d Cir. 1971).[6]

---

[6] See also *Ochs v. Commissioner,* 195 F.2d 692, 698 (2d Cir. 1952) (Frank, *J.,* dissenting):

"Line-drawing may be difficult here as everywhere, but that is what courts are for. See Lavery v. Purssell, 399 Ch.D 508, 517: '* * * courts of justice ought not to be puzzled by such old scholastic questions as to where a horse's tail begins and where it ceases. You are obliged to say, this is a horse's tail at some time.' "

In the instant case, it is clear that, at the time the board received petitioners' gift, the right to receive liquidating distributions on the donated shares had already become perfected. Petitioners, as the shareholders of TCC, had not only adopted a plan of liquidation which specifically authorized the officers to pay debts and distribute the remaining assets to the shareholders; at the November 19 meeting, they had fixed and directed the payment of specified distributions on all shares in complete liquidation of the corporation, including particularly those to be transferred to the board. That act amounted to the actual declaration of liquidating dividends. No further corporate authorization or action—beyond the purely ministerial act of executing the quitclaim deed—was required or taken to complete the distribution of the buildings to the board. Such being the case, the "realities and substance" were that petitioners' right to the proceeds had so "matured" or "ripened" (see *S.C. Johnson & Son, Inc.,* 63 T.C. 778, 786 (1975)), that they could not avoid the tax on the resulting gain by transferring that right prior to actual distribution. *Jones v. United States, supra; Kinsey v. Commissioner,* 477 F.2d 1058 (2d Cir. 1973); *Hudspeth v. United States,* 471 F.2d 275 (8th Cir. 1972). Cf. *Mark G. Anton,* 34 T.C. 842 (1960), affd. sub nom. *Smith's Estate v. Commissioner,* 292 F.2d 478 (3d Cir. 1961); *Howard Cook,* 5 T.C. 908 (1945). See Walker, "Stock transfers to charity during liquidation: Can they be made to work?" 40 J. Tax. 291 (1974).

Petitioners point to language in *Hudspeth v. United States, supra,* and *Kinsey v. Commissioner, supra,* which indicates that the absence of the possibility of reversal of the decision to liquidate by the donee was a significant factor. They argue that, therefore, those cases are distinguishable because, in the instant case, the board acquired a controlling interest in TCC which it could have exercised to rescind the liquidation. But, it is clear that neither the Second Circuit Court of Appeals in *Kinsey* nor the Eighth Circuit Court of Appeals in *Hudspeth* intended its reference to the absence of the power to rescind to do more than distinguish other decisions—in *Kinsey,* the Sixth Circuit Court of Appeals decision in *Jacobs v. United States, supra,* now overruled by *Jones v. United States, supra,* and in *Hudspeth,* our decision in *W. B. Rushing,* 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971). At most, the language in *Kinsey* and *Hudspeth* stands for the proposition recently enunciated in *Jones v. United States,*

*supra,* that the situs of control is only one factor to be considered in ascertaining the "realities and substance" of the transaction. In this connection, we observe that nothing in *W. B. Rushing, supra,* precludes the application of the test adopted herein; as this Court pointed out (52 T.C. at 898) and the Fifth Circuit Court of Appeals emphasized (see 441 F.2d at 597), that case dealt with the question of *when* and *not whether* the gain was taxable (an installment sale was involved) and an *affirmative* act on the part of the transferee was necessary, namely, authorization of the distribution of the assets in liquidation (see 52 T.C. at 897)—an act which had occurred prior to the transfers in the instant case.

*Simmons v. United States,* 341 F. Supp. 947 (M.D. Ga. 1972), and *Charleston National Bank v. United States,* 323 F. Supp. 530 (S.D. W.Va. 1971), which seem to provide some sustenance for petitioners, are not only factually distinguishable, but the decisions therein rested on the authority of *Jacobs v. United States, supra;* they have been sapped of their vitality by the over-ruling of *Jacobs* by *Jones v. United States, supra. Winton v. Kelm,* 122 F. Supp. 649 (D. Minn. 1954), and *Apt v. Birmingham,* 89 F. Supp. 361 (N.D. Iowa 1950), are also distinguishable on their facts.

In short, we hold that the transfers to the board herein were so timed and structured that "for all practical purposes [the] corporate stock had no further purposes to fulfill except to receive the corporate assets upon [liquidation] and the actual [liquidation] was a mere formality." See *Apt v. Birmingham,* 89 F. Supp. at 393. The liquidation of TCC had proceeded too far down the road to enable petitioners to escape taxation on the gain attributable to the donated shares.

*Decisions will be entered for the respondent.*