CLAIR E. ROBERTS AND BETTY B. ROBERTS, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1338–77.     Filed November 30, 1978.

*Charles P. Duffy* and *Roy E. Adkins,* for the petitioners.
*Leo A. Reinikka, Jr.,* for the respondent.

STERRETT, *Judge:* Respondent, on January 11, 1977, issued a statutory notice in which he determined the following deficiencies in petitioners' Federal income tax:

---

| Taxable year | Amount |
|---|---|
| 1971 ................................... | $117,006.19 |
| 1972 ................................... | 216,843.00 |
| 1973 ................................... | 10,319.03 |

The sole issue for our determination is whether petitioners properly elected to report the gain resulting from the sale of certain stock on the installment basis under section 453, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Clair E. Roberts and Betty B. Roberts, husband and wife, resided in Eugene, Ore., at all times material herein. Their cash basis returns for their calendar years 1971, 1972, and 1973 were filed with the Internal Revenue Service Center, Ogden, Utah, as was their amended return for their taxable year 1973. Petitioners are the parents of three children, Sandra Lea Roberts, Jack R. Roberts, and Rohn M. Roberts, whose ages in June of 1971 were 21, 18, and 16, respectively. Betty B. Roberts is a party to this action only because she joined in the filing of these returns and, accordingly, Clair E. Roberts will hereinafter be referred to as petitioner.

Petitioner began his association with Sambo's Restaurants in September of 1961. After a training period, petitioner and three other individuals, including his brother, L.J., who was one of the cofounders, another cofounder, and a cofounder's son, split off from the parent company and formed a separate corporation, Sambo's Northwest, Inc. His initial and only cash contribution was $200. In May of 1969, the various Sambo's corporations were consolidated under one head, Sambo's Restaurants, Inc. (hereinafter Sambo's). As a result of this reorganization, petitioner received a substantial number of shares in the new corporation. This stock was registered under the securities laws and, during the years 1971 to 1973, was traded on the American and Pacific Coast Stock Exchanges. The stock is now traded on the New York Stock Exchange.

Under date of June 2, 1971, petitioners, as trustors, and Ralph M. Roberts and Edward E. Rubey, as trustees (hereinafter

trustees), entered into an irrevocable written "Declaration of Trust." On that date, petitioners transferred to such trustees the cash sum of $2,500. The petitioners reserved no power to appoint successor trustees and the trust prohibits the petitioners from becoming successor trustees. The petitioners reserved no right to revoke, terminate, alter, or amend the trust in any manner, and petitioners retained no power to direct the trust's investments. The trust is to continue until 1991 at which time the remaining assets will be distributed equally among the three children.

Trustee Ralph M. Roberts is petitioner's eldest brother. He resides in Sun City, Ariz. Trustee Edward E. Rubey is a certified public accountant who, at all times material herein, has been the accountant for petitioner. Edward E. Rubey's offices are in Eugene, Ore.

On June 2, 1971, petitioner sold 5,000 shares of the common stock of Sambo's to the trustees for $182,292.30. Such price was the net selling price of the stock on that day on the American and the Pacific Coast Stock Exchanges.[1] In payment for the 5,000 shares, the trustees executed and delivered to petitioner their promissory note in the amount of $180,000, together with the promise stated therein to pay the additional sum of $2,292.30 on or before September 2, 1971. The latter amount was paid on or about August 18, 1971. On the same day, the trustees sold the 5,000 shares on the open market through Shearson, Hammill & Co., a securities firm having an office in Sun City, Ariz. The ultimate purchasers were unknown to either petitioners or the trustees. The trustees received the net proceeds of $182,292.30 from the securities dealer.

On December 8, 1971, petitioner sold an additional 5,000 shares of the common stock of Sambo's to the trustees for $193,635.44, which amount was the net selling price of the stock on December 8 and December 10, 1971, on the American and the Pacific Coast Stock Exchanges. In payment, the trustees executed and delivered to petitioner their promissory note in the amount of $192,000, together with the promise stated therein to pay the additional sum of $1,635.44 on or before April 1, 1972. The latter

[1]The parties agree that the terms "sold," "purchased," "payment," or similar terms or words used hereinafter do not necessarily characterize the true nature of the transactions described. The parties also agree that the phrase "net selling price of the stock" and the term "net proceeds" as used herein mean amounts equal to the net amounts received by the trustees upon the sales of the stock through the securities firm of Shearson, Hammill & Co., as shown on sales confirmations issued by said securities firm in connection with the sales of the Sambo's Restaurants, Inc., stock described herein.

amount was paid by the trustees on or about March 30, 1972. On December 8 and December 10, 1971, the trustees sold the 5,000 shares on the open market through Shearson, Hammill & Co., the ultimate purchasers being unknown to petitioners or the trustees. The trustees received the net proceeds of $193,635.44 from the securities dealer.

In filing their Federal income tax return for the year 1971, petitioners made a timely election to report these sales on the installment method pursuant to the provisions of section 453. Respondent agrees that, if petitioners' other contentions are correct, less than 30 percent of the respective selling prices was received by petitioners in the taxable year 1971. Also reported on petitioners' 1971 return was the sale by petitioner during 1971 of an additional 11,000 shares of the common stock of Sambo's on the open market at a net sales price of $313,043.05 with a cost basis of $77, resulting in a long-term capital gain of $312,966.05. Petitioners paid the full capital gains tax on this sale with their 1971 return.

On September 27, 1972, petitioner sold an additional 5,921 shares of the common stock of Sambo's to the trustees for $214,331.84, which was the net selling price of the stock on September 27 and October 5, 1972, on the American and Pacific Coast Stock Exchanges. In payment for the 5,921 shares, the trustees executed and delivered to petitioner their promissory note in the amount of $212,000, together with the promise stated therein to pay the additional sum of $2,331.84 on or before January 10, 1973. The latter amount was paid by the trustees on or about January 10, 1973. On September 27 and October 5, 1972, the trustees sold the 5,921 shares on the open market through Shearson, Hammill & Co., with the ultimate purchasers being unknown to petitioners or the trustees. The trustees received the net proceeds of $214,331.84 from the securities dealer.

On or about December 21, 1972, petitioner sold an additional 10,000 shares of the common stock of Sambo's to the trustees for $417,299.84, which was the net selling price of the stock on December 21 and December 29, 1972, on the American and the Pacific Coast Stock Exchanges. In payment for the 10,000 shares, the trustees executed and delivered to petitioner their promissory note in the amount of $416,000, together with the promise stated therein to pay the additional sum of $1,299.84 on or before April 10, 1973. The latter amount was paid by the

trustees on or about April 10, 1973. On December 21, 1972, the trustees sold 9,400 shares, and on December 29, 1972, they sold the remaining 600 shares on the open market through Shearson, Hammill & Co., with the ultimate purchasers being unknown to petitioners or the trustees. The trustees received the net proceeds of $417,299.84 from the securities dealer.[2]

In filing their Federal income tax return for their taxable year 1972, petitioners made a timely election to report the 1972 sales on the installment method pursuant to the provisions of section 453. Respondent agrees that, if petitioners' other contentions are correct, less than 30 percent of the respective selling prices in these transactions was received by petitioners during their taxable year 1972. Also reported on petitioners' 1972 Federal income tax return were three other sales by petitioner during 1972 of additional shares of common stock of Sambo's on the open market at sales prices aggregating $645,044.02 with no cost basis claimed, resulting in long-term capital gains of $645,044.02. Petitioners paid the full capital gains tax on such sales with their 1972 return.

In filing their Federal income tax return for their taxable year 1973, petitioners reported a sale by them in that year of 5,000 additional shares of the common stock of Sambo's on the open market at a net sales price of $123,756.20 with no basis claimed, resulting in a long-term capital gain in the amount of $123,756.20. The petitioners paid the full capital gains tax on such with their 1973 return.

The trustees have made all the payments of both principle and interest required by the June 2, 1971, declaration of trust and the promissory notes dated June 2, 1971, December 8, 1971, September 27, 1972, and December 21, 1972. The following table reflects the total amounts paid for each note during the years 1971 to 1976:

| Reference number | Date | Sale amount | Reference number | Date | Sale amount |
|---|---|---|---|---|---|
| 1 | 6/2/71 | $182,292.30 | 3 | 9/27/72 | $214,331.84 |
| 2 | 12/8/71 | 193,635.44 | 4 | 12/21/72 | 417,299.84 |

[2]For the sale of the 600 shares, the "trade date" was Dec. 29, 1972, but the "payment date" was Jan. 6, 1973. The parties have stipulated that, if petitioners' contentions are correct, a sale of the 600 shares was effected and properly reported by the petitioners on the installment basis in their taxable year 1972; if respondent's contentions are correct, a sale by the petitioners was effected and the entire gain was realized by petitioners in their taxable year 1973 when the cash proceeds were received by the trustees from the securities company.

## C. E. ROBERTS TRUST
SUMMARY OF ANNUAL PAYMENTS AND BALANCES DUE
ON INSTALLMENT PURCHASES OF SAMBO'S, INC., STOCK

| Note | Interest | Principal | 12/31 Balance |
|------|---------|-----------|---------------|
| *1971* | | | |
| No. 1 | | $2,292.30 | $180,000.00 |
| No. 2 | | | |
| No. 3 | | | |
| No. 4 | | | |
| Year totals | | 2,292.30 | 180,000.00 |
| *1972* | | | |
| No. 1 | $9,000.00 | | 180,000.00 |
| No. 2 | 4,800.00 | 1,635.44 | 192,000.00 |
| No. 3 | | | |
| No. 4 | | | |
| Year totals | 13,800.00 | 1,635.44 | 372,000.00 |
| *1973* | | | |
| No. 1 | 9,000.00 | | 180,000.00 |
| No. 2 | 9,540.05 | 4,836.25 | 187,163.75 |
| No. 3 | 7,891.35 | 7,062.90 | 207,268.94 |
| No. 4 | 10,400.00 | 1,299.84 | 416,000.00 |
| Year totals | 36,831.40 | 13,198.99 | 990,432.69 |
| *1974* | | | |
| No. 1 | 9,000.00 | | 180,000.00 |
| No. 2 | 9,233.21 | 6,735.19 | 180,428.56 |
| No. 3 | 10,241.18 | 6,588.70 | 200,680.24 |
| No. 4 | 20,684.92 | 9,283.56 | 406,716.44 |
| Year totals | 49,159.31 | 22,607.45 | 967,825.24 |
| *1975* | | | |
| No. 1 | 8,871.81 | 6,908.63 | 173,091.37 |
| No. 2 | 8,890.09 | 7,078.31 | 173,350.25 |
| No. 3 | 9,905.52 | 6,924.36 | 193,755.88 |
| No. 4 | 20,095.91 | 12,928.73 | 393,787.71 |
| Year totals | 47,763.33 | 33,840.03 | 933,985.21 |
| *1976* | | | |
| No. 1 | 8,519.84 | 7,260.60 | 165,830.77 |
| No. 2 | 8,529.47 | 7,438.93 | 165,911.32 |
| No. 3 | 9,552.76 | 7,277.12 | 186,478.76 |
| No. 4 | 19,437.26 | 13,587.38 | 380,200.33 |
| Year totals | 46,039.33 | 35,564.03 | 898,421.18 |

## PAYMENTS TO C. E. ROBERTS FROM SALE NO. 1

### 6/2/71 (first 12 payments interest only) $182,292.30

|            | Principal  | Interest  | Balance      |
|------------|-----------|-----------|--------------|
| 8/18/71    | $2,292.30 | $0        | $180,000.00  |
| 1/18/72    |           | 2,250.00  |              |
| 4/18/72    |           | 2,250.00  |              |
| 7/18/72    |           | 2,250.00  |              |
| 10/18/72   |           | 2,250.00  |              |
|            |           | 9,000.00  |              |
| 1/18/73    |           | 2,250.00  |              |
| 4/18/73    |           | 2,250.00  |              |
| 7/18/73    |           | 2,250.00  |              |
| 10/18/73   |           | 2,250.00  |              |
|            |           | 9,000.00  |              |
| 1/3/74     |           | 2,250.00  |              |
| 4/4/74     |           | 2,250.00  |              |
| 7/8/74     |           | 2,250.00  |              |
| 10/8/74    |           | 2,250.00  |              |
|            |           | 9,000.00  |              |
| 1/3/75     | 1,695.11  | 2,250.00  | 178,304.89   |
| 4/3/75     | 1,716.30  | 2,228.81  | 176,588.59   |
| 7/2/75     | 1,737.75  | 2,207.36  | 174,850.84   |
| 10/1/75    | 1,759.47  | 2,185.64  | 173,091.37   |
|            | 6,908.63  | 8,871.81  |              |
| 1/5/76     | 1,781.47  | 2,163.64  | 171,309.90   |
| 4/1/76     | 1,803.74  | 2,141.37  | 169,506.16   |
| 7/7/76     | 1,826.28  | 2,118.83  | 167,679.88   |
| 10/8/76    | 1,849.11  | 2,096.00  | 165,830.77   |
|            | 7,260.60  | 8,519.84  |              |
| 1/3/77     | 1,872.23  | 2,072.88  | 163,958.54   |
| 4/4/77     | 1,895.63  | 2,049.48  | 162,062.91   |
| 7/6/77     | 1,919.32  | 2,025.79  | 160,143.59   |
| 10/7/77    | 1,943.32  | 2,001.79  | 158,200.27   |
|            | 7,630.50  | 8,149.94  |              |

PAYMENTS TO C. E. ROBERTS FROM SALE NO. 2

12/8/71 (first 3 payments interest only) $193,635.44

|  | Principal | Interest | Balance |
|---|---|---|---|
| 3/30/72 | $1,635.44 | | $192,000.00 |
| 7/1/72 | | $2,400.00 | |
| 10/8/72 | | 2,400.00 | |
| | 1,635.44 | 4,800.00 | |
| 1/10/73 | | 2,400.00 | |
| 4/10/73 | 1,592.10 | 2,400.00 | 190,407.90 |
| 7/10/73 | 1,612.00 | 2,380.10 | 188,795.90 |
| 10/10/73 | 1,632.15 | 2,359.95 | 187,163.75 |
| | 4,836.25 | 9,540.05 | |
| 1/3/74 | 1,652.55 | 2,339.55 | 185,511.20 |
| 4/4/74 | 1,673.21 | 2,318.89 | 183,837.99 |
| 7/8/74 | 1,694.13 | 2,297.97 | 182,142.86 |
| 10/8/74 | 1,715.30 | 2,276.80 | 180,428.56 |
| | 6,735.19 | 9,233.21 | |
| 1/3/75 | 1,736.74 | 2,255.36 | 178,691.82 |
| 4/3/75 | 1,758.45 | 2,233.65 | 176,933.37 |
| 7/2/75 | 1,780.43 | 2,211.67 | 175,152.94 |
| 10/1/75 | 1,802.69 | 2,189.41 | 173,350.25 |
| | 7,078.31 | 8,890.09 | |
| 1/5/76 | 1,825.22 | 2,166.88 | 171,525.03 |
| 4/1/76 | 1,848.04 | 2,144.06 | 169,676.99 |
| 7/7/76 | 1,871.14 | 2,120.96 | 167,805.85 |
| 10/8/76 | 1,894.53 | 2,097.57 | 165,911.32 |
| | 7,438.93 | 8,529.47 | |
| 1/3/77 | 1,918.21 | 2,073.89 | 163,993.11 |
| 4/4/77 | 1,942.19 | 2,049.91 | 162,050.92 |
| 7/6/77 | 1,966.46 | 2,025.64 | 160,084.46 |
| 10/7/77 | 1,991.04 | 2,001.05 | 158,093.42 |
| | 7,817.90 | 8,150.50 | |

PAYMENTS TO C. E. ROBERTS FROM SALE NO. 3

9/2/72 Principal Interest $214,331.84

| | Principal | Interest | Balance |
|---|---|---|---|
| 1/10/73 | $2,331.84 | $2,650.00 | $212,000.00 |
| 4/10/73 | 1,557.47 | | 210,442.53 |
| 7/10/73 | 1,576.94 | 2,630.53 | 208,865.59 |
| 10/10/73 | 1,596.65 | 2,610.82 | 207,268.94 |
| | 7,062.90 | 7,891.35 | |
| 1/3/74 | 1,616.61 | 2,590.85 | 205,652.33 |
| 4/4/74 | 1,636.82 | 2,570.65 | 204,105.51 |
| 7/8/74 | 1,657.28 | 2,550.19 | 202,358.23 |
| 10/2/74 | 1,677.99 | 2,529.48 | 200,680.24 |
| | 6,588.70 | 10,241.18 | |
| 1/3/75 | 1,698.97 | 2,508.50 | 198,981.27 |
| 4/6/75 | 1,720.20 | 2,487.27 | 197,261.07 |
| 7/2/75 | 1,741.71 | 2,465.76 | 195,519.36 |
| 10/1/75 | 1,763.48 | 2,443.99 | 193,755.88 |
| | 6,924.36 | 9,905.52 | |
| 1/5/76 | 1,785.52 | 2,421.95 | 191,970.36 |
| 4/1/76 | 1,807.84 | 2,399.63 | 190,162.52 |
| 7/7/76 | 1,830.44 | 2,377.03 | 188,332.08 |
| 10/8/76 | 1,853.32 | 2,354.15 | 186,478.76 |
| | 7,277.12 | 9,552.76 | |
| 1/3/77 | 1,876.49 | 2,330.98 | 184,602.27 |
| 4/4/77 | 1,899.94 | 2,307.53 | 182,702.33 |
| 7/2/77 | 1,923.69 | 2,283.78 | 180,778.64 |
| 10/7/77 | 1,947.74 | 2,259.73 | 178,830.90 |
| | 7,647.86 | 9,182.02 | |

PAYMENTS TO C. E. ROBERTS FROM SALE NO. 4

12/21/72 (first 3 payments interest only) $417,299.84

|  | *Principal* | *Interest* | *Balance* |
|---|---|---|---|
| 4/10/73 | $1,299.84 |  | $416,000.00 |
| 7/10/73 |  | $5,200.00 |  |
| 10/10/73 |  | 5,200.00 |  |
|  | 1,299.84 | 10,400.00 |  |
| 1/3/74 |  | 5,200.00 |  |
| 4/4/74 | 3,056.16 | 5,200.00 | 412,943.84 |
| 7/8/74 | 3,094.36 | 5,161.80 | 409,849.48 |
| 10/2/74 | 3,133.04 | 5,123.12 | 406,716.44 |
|  | 9,283.56 | 20,684.92 |  |
| 1/8/75 | 3,172.20 | 5,083.96 | 403,544.24 |
| 4/3/75 | 3,211.86 | 5,044.30 | 400,332.38 |
| 7/2/75 | 3,252.01 | 5,004.15 | 397,080.37 |
| 10/1/75 | 3,292.66 | 4,963.50 | 393,787.71 |
|  | 12,928.73 | 20,095.91 |  |
| 1/5/76 | 3,333.81 | 4,922.35 | 390,453.90 |
| 4/1/76 | 3,375.49 | 4,880.67 | 387,078.41 |
| 7/7/76 | 3,417.68 | 4,838.48 | 383,660.73 |
| 10/8/76 | 3,460.40 | 4,795.76 | 380,200.33 |
|  | 13,587.38 | 19,437.26 |  |
| 1/3/77 | 3,503.66 | 4,752.50 | 376,696.67 |
| 4/4/77 | 3,547.45 | 4,708.71 | 373,149.22 |
| 7/2/77 | 3,591.79 | 4,664.37 | 369,557.43 |
| 10/7/77 | 3,636.69 | 4,619.47 | 365,920.74 |
|  | 14,279.59 | 18,745.05 |  |

No security was ever given to petitioner by the trustees to insure payment of any of the promissory notes. Petitioner never attempted to direct the trustees with respect to their investment of the sales proceeds.

## OPINION

The general rule is that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis of the property. Sec. 1001(a).[3] Such gain is generally included in the taxpayer's computation of taxable income according to his normal accounting method. Sec. 446(a).[4] However, in certain circumstances section 453[5] provides for the reporting of income on the installment method. Thus, in the case of casual sales of personalty, a taxpayer may report on the installment method if he disposes of property on an installment plan and the payments received in the taxable year of sale, if any, do not exceed 30 percent of the selling price. Sec. 453(b).

---

[3]SEC. 1001(a). COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis * * *

[4]SEC. 446(a). GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

[5]SEC. 453(a). DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.— * * * a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. * * *

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from * * *

(B) a casual sale or other casual disposition of personal property * * * for a price exceeding $1,000,

may * * * be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—

(A) there are no payments, or

(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

The purpose of section 453 is to provide relief for the taxpayer by matching the payment of the tax to the receipt of the sales price. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948).

In his statutory notice, respondent contends that petitioners may not report the gain from the sale of stock on the installment method "because the proceeds of the sales in the open market were within [their] control and at [their] direction were paid to the trusts so that [they] made an anticipatory assignment of the sales proceeds to the trust." On brief he claims that there was no bona fide sale and that petitioner had no nontax business purpose necessitating an installment sale. In other words, respondent considers the trust to be a mere conduit used by petitioner in order to utilize the installment provisions of section 453.

Petitioner counters that he has satisfied the two-prong test established by *Rushing v. Commissioner*, 441 F.2d 593, 598 (5th Cir. 1971), affg. 52 T.C. 888 (1969), because the existence of a viable and independent trust prevented his receipt of the proceeds from the sale of Sambo's stock. We agree with petitioner.

The *Rushing* test prohibits the application of the installment method of reporting by a grantor who has sold property to a trust if (1) he has control of, or (2) the economic benefit of the proceeds. Petitioner has satisfied this test. Respondent does not question that the trust was irrevocable nor that it was a valid and distinct entity under local law. Petitioner retained no right to alter or amend the trust agreement or to remove the trustees. The trustees were petitioner's accountant and his brother. While independence must be scrutinized when there exists a close relationship between the parties (cf. *Wrenn v. Commissioner*, 67 T.C. 576 (1976)), petitioner has provided sufficient proof that the trustees herein acted independently. One trustee, the accountant, primarily kept books for the trust and served as a backboard on which the second trustee could play off his investment ideas. With respect to the second trustee, petitioner's older brother, we find that it was the elder brother who influenced petitioner. The brother not only instigated the various sales from petitioner to the trust, but also the formation of the trust itself. This brother had been petitioner's investment adviser for years.

Petitioner fully expected that the stock would be resold. He

agreed to settle for the net selling price of the stock as of the day of transfer as set by the American and the Pacific Coast Stock Exchanges. However, prearrangement of a selling price based on a market value that cannot be influenced by either the purchaser or seller is a normal practice sanctioned by the Uniform Commercial Code. U.C.C. sec. 2–201, official comment No. 1. The proceeds were invested without consultation between the trustees and petitioner. The initial assumption was that the proceeds would be invested predominantly in mutual funds.[6] The trustees, however, considered it advantageous to diversify the investments by purchasing improved real property. At the time of trial, the trust corpus was invested in two mutual funds, convertible bonds and improved real estate.

Although the trustees did not purchase the stock from petitioner in one block, but instead initiated each purchase when they felt the market had peaked, they were under no legal commitment or economic compulsion to resell the stock at that time. Compare *Pityo v. Commissioner*, 70 T.C. 225 (1978), on appeal (5th Cir., Oct. 17, 1978), with *Lustgarten v. Commissioner*, 71 T.C. 303 (1978). The trustees acted affirmatively in choosing when to sell the stock and where to invest the proceeds. They were not passive conduits for petitioner's acts. Cf. *Allen v. Commissioner*, 66 T.C. 340, 348 (1976).

Respondent objects to our use of the *Rushing* control test. We do not accept his reasoning. The control test is merely an approach used to determine whether the intermediate party has independent significance or is merely a puppet of the grantor/seller. Did the latter, in reality, have immediate access to all the sales proceeds? We have answered that question in the negative. The fact that the petitioner may have opted at the outset of the transaction to put the proceeds beyond his legal control does not vitiate the tax consequences attaching to the parties to the transaction once it was consummated.

We note that petitioner's lack of security in the transaction left him as a party at risk. The transaction did not shift the tax liability or attempt to assign income to a third party. It did not affect the amount of gain or attempt to change the character of income from ordinary to capital. Petitioner had a business

---

[6]We note that in *Pityo v. Commissioner*, 70 T.C. 225, 229 (1978), the trustees were under a specific direction to invest the proceeds in mutual funds. In addition, the grantor therein had reserved the right to replace the trustee.

reason for the transaction, his belief that the trust could be used to diversify his holdings, and a personal reason, the transfer of assets to his children and the subsequent investment thereof at a return higher than the interest rate on the notes. Both his business and his personal reasons indicate that the transaction was bona fide. See *Wrenn v. Commissioner, supra* at 583.

We find that petitioner properly reported income from the sale of stock on the installment method. His receipt of the proceeds derived from the ultimate sale of the stock was subject to substantial restrictions. See *Stiles v. Commissioner*, 69 T.C. 558, 566 (1978).

*Decision will be entered under Rule 155.*