PAUL G. LUSTGARTEN AND JACQUELINE LUSTGARTEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9083–76.     Filed November 30, 1978.

*Michael R. Harris,* for the petitioners.
*Thomas M. Cryan,* for the respondent.

STERRETT, *Judge:* Respondent, on July 23, 1976, issued a statutory notice in which he determined a deficiency in petitioners' Federal income tax for the calendar year 1971 in the amount of $346,075. After concessions by the parties, the sole issue remaining for our determination is whether petitioners are entitled to report the gain resulting from the sale of 42,000 shares of Cooper Laboratories, Inc., common stock on the installment basis under section 453, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Paul G. Lustgarten and Jacqueline Lustgarten, husband and wife, resided in Miami Beach, Fla., at the time the petition herein was filed. Petitioners filed their Federal income tax return for their taxable year 1971 with the Director of the Internal Revenue Service Center, Chamblee, Ga. Petitioners have two children, Bruce A. Lustgarten (hereinafter Bruce) and Elaine L. Goldenberg (hereinafter Elaine). Jacqueline Lustgarten is a party to this action only because she joined in the filing of the return and, accordingly, Paul G. Lustgarten will hereinafter be referred to as petitioner.

On September 15, 1967, petitioner received 70,000 shares of Cooper Laboratories, Inc. (hereinafter Cooper), common stock in connection with the merger of Wynne Pharmaceuticals, Inc., with Cooper. Thereafter, but prior to the declaration of a two-for-one split, petitioner sold 27,700 shares. After the split, but prior to November 15, 1971, he owned 67,600 shares of the stock.

Petitioner had been an employee of Vitamix Pharmaceuticals which sold out to Cooper sometime around 1967 or 1968. He continued to be employed by Cooper until his employment terminated during 1971. At this time, Cooper stock represented a substantial portion of petitioner's assets. This stock had paid one

stock dividend, but no cash dividends. It was lettered stock, subject to restrictions on transfer.

On November 15, 1971, petitioner entered into an agreement with Bruce with respect to the sale of 42,000 shares of Cooper common stock. The agreement, entitled "Installment Sales Contract," provided for the sale of Cooper stock to Bruce in exchange for $1,017,590.69. The sales price was payable in 120 monthly installments of $10,302.61 which amount included principal and interest at 4 percent per annum on the unpaid balance. The first payment was due January 1, 1972, with the remaining payments due on the first day of each successive month. Paragraph three of the agreement provided as follows:

3. No recourse or personal liability shall at any time be had under this contract against BRUCE, his heirs, Executors, administrators or assigns, for the payment of the purchase price. In lieu of such personal liability, BRUCE agrees as follows:

a. To evidence the amount of the purchase price by executing and delivering to Paul a Promissory note in the form attached hereto as Exhibit A.

b. To assure payment of the purchase price by purchasing $1,017,590.69 worth of shares of Sigma Investment Shares, Inc. concurrently with the execution of this contract, and transferring and delivering the same to American Guaranty & Trust Company as escrow agent under the provisions of an Escrow Agreement dated concurrently herewith, a copy of which is attached hereto as Exhibit B.

The installment note and escrow agreement were also dated November 15, 1971. The escrow agreement specifically required Bruce to purchase and then transfer $1,017,590.69 worth of Sigma Investment Shares, Inc. (hereinafter Sigma), to American Guaranty & Trust Co. as escrow agent. Such shares in the stated amount of 89,322 were to be purchased and transferred concurrently with the execution of the subject agreement. Bruce's net worth in 1971 was not sufficient to purchase the stipulated amount of Sigma shares.

The escrow agreement further provided that the monthly payment to petitioner of $10,302.61 dictated by the "Installment Sales Contract" and "Promissory Note" was to be paid out of the escrow fund from the "income dividends, capital gains distributions, and/or from the proceeds of liquidation" of such shares. The agreement gave Bruce the voting rights over the shares. Although the agreement provided that Bruce was to be liable for administrative fees, it provided further that such fees were to be paid out of the escrow fund.

On November 15, 1971, in accordance with paragraph three of the purported installment sales contract, Bruce instructed his stockbroker to sell the 42,000 shares of Cooper common stock and to use the entire proceeds to purchase $1,017,590.69 worth of shares of Sigma, a mutual fund. The Cooper stock was sold on the following dates:

| Date | Number of shares |
|------|------------------|
| 11/17/71 | 2,000 |
| 11/18/71 | 1,300 |
| 12/1/71 | 38,700 |

Bruce acquired Sigma shares as follows:

| Date | Number of shares |
|------|------------------|
| 11/18/71 | 7,347 |
| 12/1/71 | 81,975 |

On November 15, 1971, petitioner executed an indenture of trust in which Elaine was named the primary beneficiary, and Bruce, and Benjamin Lustgarten, petitioner's brother, were appointed cotrustees. The only property transferred by petitioner to the trustees was $10. From November 15, 1971, to the date the supplemental stipulation was executed, March 1, 1978, petitioner did not make additions to the principal of the trust. Benjamin Lustgarten died approximately 2 years before the trial of this case. As of that time, no successor trustee was appointed either by petitioner in accordance with subparagraph B of paragraph VI of the trust indenture or by Bruce in accordance with paragraph XIII of such indenture of trust. The trust was irrevocable.

On November 15, 1971, Bruce, individually and as trustee under the indenture of trust of the same date, executed an agreement entitled "Joint Venture Agreement." This agreement made reference to the installment sales contract and stated that the purpose of such agreement was to set forth and define their rights and obligations in connection with such transactions. The record is void with respect to the activities undertaken pursuant to this agreement.

As a result of Bruce's entering into this purported installment sales contract with petitioner and the joint venture with the trust set up for Elaine, the following items appeared on Bruce's Federal income tax return:

| Year | Item | Amount |
|---|---|---|
| 1972 | Dividends | $10,996.00 |
| | Ordinary losses from joint venture (utilized on Bruce's return) | 19,606.00 |
| | Long-term capital gains after sec. 1202 deduction | 14,907.00 |
| | Short-term capital gains | 2,457.00 |
| 1973 | Dividends | 11,908.86 |
| | Ordinary losses from joint venture (utilized on Bruce's return) | 17,887.51 |
| | Long-term capital gains after sec. 1202 deduction | 13,017.42 |
| 1974 | Dividends | 13,801.00 |
| | Ordinary losses from joint venture (utilized on Bruce's return) | 16,097.00 |
| | Long-term capital losses from joint venture ($1,163 used to offset long-term capital gain on Bruce's return and $1,000 claimed as an ordinary loss) | 14,403.00 |
| 1975 | Dividends | 11,837.00 |
| | Ordinary losses from joint venture (utilized on Bruce's return) | 14,233.00 |
| | Long-term capital losses from joint venture ($1,000 ordinary loss utilized on Bruce's return) | 15,217.00 |
| 1976 | Dividends | 10,529.00 |
| | Ordinary losses from joint venture (utilized on Bruce's return) | 12,293.00 |
| | Long-term capital losses from joint venture (utilized on Bruce's return) | 1,533.00 |

Such agreements resulted in Elaine's reporting the following items:

| Year | Item | Amount |
|------|------|--------|
| 1972 | Dividends............................................ | $10,996.00 |
|      | Ordinary loss from joint venture (utilized on Elaine's return) ............... | 19,606.00 |
|      | Long-term capital gains from joint venture after sec. 1202 deduction ...... | 14,906.00 |
|      | Short-term capital gains ....................... | 2,457.00 |
| 1973 | Dividends ....................................... | 11,908.85 |
|      | Ordinary loss from joint venture (utilized on Elaine's return) .............. | 17,887.51 |
|      | Long-term capital gains after sec. 1202 deduction .......................... | 13,017.42 |
| 1974 | Ordinary loss from joint venture (not utilized on Elaine's return) ......... | 2,296.00 |
| 1975 | Ordinary loss from joint venture ($1,041 utilized on Elaine's return) .... | 2,396.00 |
| 1976 | Dividends ....................................... | 10,529.00 |
|      | Ordinary losses from joint venture (utilized on Elaine's return) .............. | 12,294.00 |

In accordance with the November 15, 1971, escrow agreement, American Guaranty & Trust Co. held 44,862 shares of Sigma on December 31, 1977.

## OPINION

The general rule is that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis of the property. Sec. 1001(a).[1] Such gain is generally included in the taxpayer's computation of taxable income according to his normal accounting method. Sec. 446(a).[2] However, in certain circumstances section 453[3] provides for the

---

[1]SEC. 1001(a). COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis * * *

[2]SEC. 446 (a). GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

[3]SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.— * * * a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

reporting of income on the installment method. Thus, in the case of casual sales of personalty, a taxpayer may report on the installment method if he disposes of property on an installment plan and the payments received in the taxable year of sale, if any, do not exceed 30 percent of the selling price. Sec. 453(b). The purpose of section 453 is to provide relief for the taxpayer by matching the payment of tax to the receipt of the sales price. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948).

Respondent has disallowed petitioner's use of the installment reporting method. He contends that petitioner's use of this method fails to comport with the purpose for which section 453 and its predeccessor provisions were enacted. Respondent does not question petitioner's need for an improved cash flow but notes that sales between family members require special scrutiny. See *Wrenn v. Commissioner*, 67 T.C. 576, 584 (1976).

The leading case with respect to installment sales to a trust created by the taxpayer is *Rushing v. Commissioner*, 441 F.2d 593, 598 (5th Cir. 1971), affg. 52 T.C. 888 (1969), wherein the Fifth Circuit proscribes application of the installment sale benefits if the seller either directly or indirectly controls the proceeds of the sale or possesses the economic benefit therefrom. Petitioner has made an attempt to align himself with the cases emanating from *Rushing*. For reasons which will become apparent, we do not believe that the *Rushing* result pertains herein. For example, petitioner has overlooked a second line of cases wherein an escrow account was used to secure the sellers receipt of the installment payments. This line of cases is

---

(2) TOTAL CONTRACT PRICE.—For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. * * *

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

\*          \*          \*          \*          \*          \*          \*

(B) a casual sale or other casual disposition of personal property * * * for a price exceeding $1,000,

may * * * be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—

(A) there are no payments, or

(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

exemplified by *Pozzi v. Commissioner*, 49 T.C. 119 (1967), wherein this Court found an installment sale of property secured by funds placed in escrow resulted in the constructive receipt of the entire purchase price in the year of sale which disqualified him from the use of section 453 reporting. A constructive receipt of the purchase price would cause the taxpayer to fail the *Rushing* test because of his control over the proceeds of the sale.

Here, since it is clear that Bruce did not have sufficient assets with which to purchase the Cooper stock on the installment, or any other, basis, it is no wonder that petitioner, through the mechanism of the escrow agreement and note, required Bruce to sell the Cooper stock and reinvest those proceeds in securities holding promise of sufficient income to liquidate Bruce's debt to him. Bruce could not act as a free agent as could the trustee in *Pityo v. Commissioner*, 70 T.C. 225 (1978), on appeal (5th Cir., Oct. 17, 1978).[4] The substance of the transaction *is as if* petitioner had sold the Cooper stock, purchased the Sigma stock, then placed the latter in trust for the benefit of Elaine while retaining an income interest of $10,302.61 per year to be paid through invasion of the corpus if the income generated by the trust was insufficient to pay the prescribed amount. Cf. *Hindes v. United States*, 326 F.2d 150, 152 (5th Cir. 1964).

Petitioner points to the existence of the trust created for the benefit of his daughter and the joint venture agreement between the trustees (Bruce and Benjamin) of that trust and the purchaser of the stock (Bruce) as proof that he has satisfied the *Rushing* criteria. He contends that Bruce acted independently and was primarily concerned with his own interest and that of the trust. Even if the facts are as petitioner asserts[5] we cannot accept the mere existence of the trust and joint venture agreements as determinative of the issue.

The escrow agreement as in *Pozzi v. Commissioner, supra*, is evidence of petitioner's retention of control over the proceeds of the sale. As noted, this agreement forced Bruce to sell the stock

---

[4]Further distinguishing this case, relied on by petitioner, from the instant facts is that there were other funds available to pay off the installment obligation.

[5]The facts on the record are meager with respect to the trust and the joint venture. According to the record, the trust was, in essence, unfunded. The parties stipulated that the only property transferred by petitioner to the trust was $10. There is no other evidence in the record of other contributions to the corpus. No evidence has been submitted with respect to the operation of the joint venture. In fact, we would dismiss completely their existence had not the parties stipulated income returned by Bruce and Elaine as a result of the trust and the joint venture.

purchased from petitioner, to reinvest the *entire* proceeds of that sale in Sigma shares and to deposit 89,322 shares of that fund with the escrow agent. The escrow agreement further dictated that the monthly payment to petitioner of $10,302.61 was to be paid out of the income dividends derived from such shares or from capital gains distributions or proceeds of liquidation of such shares. The record fails to disclose the amount of income which accrued from the investment in the Sigma stock or the breakdown of the distribution of such income.[6] While we admire Bruce's candor, he testified that in case of an emergency he would convey the shares remaining in escrow to his father.

We find that petitioner failed the *Rushing* test based on his constructive receipt in 1971 of the entire proceeds of the sale of his Cooper stock arising out of his use of his son as his agent to make the sale and his beneficial use of an escrow account. Hence, he is not entitled to the deferred tax treatment offered by section 453.

*Decision will be entered under Rule 155.*

---

[6]The monthly payment of $10,302.61 to petitioner was current at the time of trial. In addition, both Bruce and Elaine, as previously noted, reported income resulting from either the trust or the joint venture. Although neither party has deemed fit to enlighten the Court with respect to the source of such income, one possibility is that the Sigma investment produced income in excess of the amount due petitioner and that such income was, in some manner, distributed to Bruce and Elaine.