JAMES H. WEAVER, JR., AND ESTATE OF BETSY M. WEAVER, DECEASED, JAMES H. WEAVER, JR., EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CARL E. WEAVER AND ELSIE S. WEAVER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5032–77, 5035–77.    Filed December 27, 1978.

*Barring Coughlin* and *Roy L. Turnell,* for the petitioners.
*Larry L. Nameroff, Joseph L. Cannella,* and *Alan C. Levine,* for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the

Federal income tax of petitioners for the taxable year 1971 as follows:

| Docket No. | Deficiency |
|---|---|
| 5032–77 ................................... | $291,799.81 |
| 5035–77 ................................... | 288,608.93 |

The sole issue for our decision is whether petitioners in these consolidated cases are entitled to utilize the installment method under section 453[1] for reporting the gain on the sale of their stock in Columbia Match Co. to irrevocable trusts created for the benefit of their children.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

James H. Weaver, Jr. (hereinafter James), and Betsy M. Weaver (hereinafter Betsy), husband and wife, resided in Cleveland, Ohio, at the time their petition was filed in this case. James, as executor of Betsy's estate, was substituted for Betsy after she died during the pendency of these proceedings. Carl E. Weaver (hereinafter Carl) and Elsie S. Weaver (hereinafter Elsie) resided in Shaker Heights, Ohio, at the time their petition was filed in this case. Each couple filed a joint income tax return on the cash receipts and disbursements method of accounting for the calendar year 1971 with the District Director of Internal Revenue, Cleveland, Ohio. Hereinafter James and Carl will be referred to collectively as petitioners since their spouses are involved in these proceedings only because they signed the joint returns.

Petitioners each owned 50 percent of the 250 outstanding shares of Columbia Match Co. (hereinafter the company), an Ohio corporation engaged in the manufacture and sale of matchmaking machinery and matchbooks. By letter dated January 29, 1971, James contacted Jose Barroso Chavez (hereinafter Barroso), a Mexico City businessman involved in the match industry, concerning the possible expansion of production into

---

[1]Unless specified otherwise, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.

Florida and investment by Barroso in the company. Pertinent excerpts from that letter follow:

Our company is a closed corporation with all shares owned by C. E. and J. H. Weaver. For sometime we have been advised to "go public" with shares in order to establish value of shares in our company that are a substantial part of our estates and to accrue money from the sale of shares to meet estate taxes that must be met sooner or later. Since we have just been through a similar problem with our Father's Estate, we cannot help but feel that advice should be heeded and, therefore, it would not be prudent for us, no matter what the desire or growth prospects are, to invest additional capital under these circumstances.

Perhaps you are considering diversification and expansion and would be interested in expanding through us * * * [into the United States and other markets].

On February 2, 1971, petitioners began to negotiate with Barroso for the sale of all of the company stock to Barroso. Negotiations explored alternative methods for structuring the transaction. By letter dated March 29, 1971, two plans were offered for Barroso's consideration. Plan A provided for Barroso to purchase 70 percent of the shares of the company for $2,100,000 payable over a 3-year period with interest at 6 percent. Plan B provided for Barroso to purchase 100 percent of the shares of the company for $2,400,000.

By letter of April 2, 1971, Barroso advised petitioners that by April 17 he would give them a definite answer about his interest in purchasing their company stock. By letter dated April 14, 1971, Barroso advised petitioners that he was interested in plan B and had referred the matter to his attorneys. On May 18, 1971, Barroso's attorney wrote petitioner and suggested on behalf of Barroso that plan B be revised to have Barroso purchase one-fourth of the stock for $600,000 and have the company redeem petitioners' remaining shares for $1,800,000.

On May 21, 1971, petitioners orally repeated their offer to sell all their stock for cash in the amount of $2,400,000. On the same date, Barroso's representatives proposed instead to buy the assets of the corporation. The parties agreed to have the assets of the corporation appraised and continued negotiations regarding price, terms, and structuring of the transaction to obtain optimal tax results.

By July 14, 1971, the parties reached a tentative agreement that the purchase would be structured as a sale of all or part of the company's assets to Barroso, with petitioners to receive in a

subsequent liquidation of the company the dollar amount equivalent to a sale of the stock for $2,100,000. This amount would be comprised in part of cash received by the corporation in its sale of assets to Barroso and in part of the company's liquid assets. The price to Barroso was to be adjusted upward to compensate petitioners for incremental tax, legal, and accounting expenses resulting from this approach.

On July 15, 1971, petitioner James H. Weaver, Jr., advised Barroso that counsel for the company had been instructed to commence preparation of a contract for the sale of the assets by the company to a corporation controlled by Barroso. Negotiations continued thereafter and the parties made arrangements to meet in Cleveland at the end of July to finalize the transaction. A draft of the purchase agreement was forwarded from Barroso's attorneys to petitioners' attorneys on July 21, 1971.

Meanwhile, before Barroso was due in Cleveland to conclude the negotiations for the sale of assets by the company, petitioners considered the possibility of selling the company stock on an installment basis to trusts prior to the asset sale. Petitioners arranged to establish irrevocable trusts for the benefit of their children, with the National City Bank of Cleveland (hereinafter the bank) as trustee. On July 27, 1971, the trust investment committee of the bank reviewed the two trusts to be executed, the opportunity of the trusts to purchase all of the stock of the company, and the plan subsequently to sell the nonliquid assets and liquidate the company. The trust investment committee approved in principle the purchase of the stock of the company from petitioners for a total of approximately $2 million payable in installments over 20 years at 4-percent interest and the subsequent sale of the nonliquid assets of the company for the same amount or more.

On July 28, 1971, James executed an irrevocable trust agreement, thereby establishing an irrevocable trust for the benefit of his four children, all of whom were adults, with the bank as trustee. James transferred to the trust marketable securities having a fair market value of $19,623.63. On the same date, Carl executed an irrevocable trust agreement, thereby establishing an irrevocable trust for the benefit of each of his three children, all of whom were adults, with the bank as

trustee, and transferred to the trust marketable securities having a fair market value of $15,150.

Under the terms of the trust agreements, the grantors have no right to control the investment or distribution of principal or interest by the trusts. Each trust agreement grants the bank, as trustee, broad powers including the following: (1) The power to accept and retain gifts of securities and corporate distributions of property even though such securities and property may not ordinarily be deemed suitable trust investments; (2) the power to purchase securities or other property on the installment method even though the terms of the purchase may restrict distributions to the beneficiaries; (3) the power to dispose of trust property in any manner including entering into any security arrangement in connection with the reorganization or liquidation of any corporation in which the trust holds securities; (4) the power to deal with itself or with the settlor and his family so long as the dealings are for adequate consideration with adequate interest and security; (5) the power to vote for or against the reorganization or liquidation of any corporation in which it holds securities.

In each agreement, a provision allows a majority of the children of the grantor to employ an investment adviser to determine trust investments. The trust provisions are carefully circumscribed, however, so that under no circumstances could the grantors, their families, or their corporations serve as investment advisers. A majority of the children of the grantor may remove the trustee, but the successor trustee appointed must be an independent financial institution.

The trust agreements also provide for the distribution annually to each beneficiary the net income derived during the preceding 12 months. In addition, the trustee is granted discretion by the trust instruments to distribute trust principal. Each trust is to terminate on the death of the beneficiary in which case the principal is to be distributed to the beneficiary's lineal decendents.

On July 29, 1971, pursuant to two installment sales agreements, the bank, as trustee, purchased from petitioners all of their stock in the company. The bank agreed to pay each petitioner $1 million in 20 equal annual installments of $50,000, with 4-percent interest on the unpaid balance. The agreements provided the bank would not make distributions of principal to

the trust beneficiaries unless the assets remaining after such a distribution would equal at least 125 percent of the purchase price remaining to be paid to petitioners. At the same time petitioners executed the agreements, they delivered duly endorsed stock certificates to the bank. Thereafter, new certificates, registered in the name of the bank, as trustee, were issued.

The bank, which was then the sole shareholder of the company, elected James and two of the bank's vice presidents as the new board of directors and elected Carl as assistant secretary of the company. The bank, as trustee, adopted a plan of liquidation providing for the sale of substantially all of the assets of the company to Colmat Co. (hereinafter Colmat), an unrelated Ohio corporation which Barroso had organized, and the subsequent liquidation of the company. The board of directors approved the draft form of the purchase agreement and authorized execution of a final agreement.

Thereafter, on the same date, a written agreement was executed by representatives of the company and Colmat for the sale of the company's nonliquid assets for $1,761,523. James, as president, signed on behalf of the company, and Carl, as assistant secretary, attested to his signature. Carl, as president of Colmat, attested to the signature of the representative of Colmat. The petitioners, as officers, directors, and former shareholders of the company also entered into an agreement with Colmat not to engage in any business in competition with Colmat or its successors for a period of 5 years. The company changed its name to Weaver Dissolution Co. so that Colmat could use the name of Columbia Match Co.

On July 30, 1971, documents transferring the appropriate assets were delivered to Colmat and the purchase price was received by the company. The company then proceeded to wind up its affairs and distributed its assets in several distributions totaling $1,049,050 per trust to the bank, as trustee. The bank, as trustee, invested these liquidating distributions in securities selected by it with the goal of accumulating capital in the trusts so that at the end of 20 years, after the installment obligations to petitioners had been paid in full, the trusts would be left with an aggregate capital account in excess of the amount of the original installment liability.

On September 30, 1971, the bank paid each petitioner the first

installment of $50,000 for the sale of stock to the trusts pursuant to the installment sales agreements. On their respective 1971 Federal income tax returns, petitioners elected to treat the sale of stock to the trusts on the installment method under section 453. Each reported an aggregate net gain realized on the installment sale of $963,694 and a recognized gain for 1971 of $48,185.

## OPINION

The issue for our decision is whether petitioners are entitled to utilize the installment method under section 453 to report gain realized upon the sale of their stock in a closely held corporation. The evidentiary facts are not in dispute. Petitioners owned all of the stock in the company. Over several months they negotiated for the sale of their stock to Barroso. By July 21, 1971, a tentative agreement was reached which called for a sale of the nonliquid assets of the company to Barroso to be followed by a liquidation of the company in which petitioners would receive funds equivalent to a sale of their stock for $2,100,000.

On July 28, 1971, however, petitioners established irrevocable trusts for the benefit of their children and sold their company stock to the trusts for $2 million payable in 20 annual installments with 4-percent interest on the unpaid balance. Thereafter, the bank, as independent trustee and sole shareholder, authorized the sale of certain of the company's assets to Barroso's nominee. The appropriate assets were sold for cash and thereafter the bank liquidated the company and received its assets which it then invested in publicly traded securities. The bank paid each petitioner the first $50,000 installment in 1971. Petitioners elected to report the gain on the sale of their stock on the installment basis under section 453 and only the gain attributable to the $50,000 each actually received in 1971 was recognized on their returns for that year.

Under section 453,[2] income from the sale of securities held as a

---

[2] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

capital asset may be reported on the installment method of accounting if the price exceeds $1,000 and if in the taxable year of the sale the payments received do not exceed 30 percent of the selling price. Respondent contends that the transactions violated the 30-percent limitation and are ineligible under section 453 since petitioners could have received 100 percent of the proceeds in 1971 by not interposing the trusts. Respondent argues that, notwithstanding the form of the sale, in light of economic reality the substance of the transactions was a direct sale and liquidation by petitioners and, consequently, constructive receipt by them of all sales proceeds in 1971.

Petitioners, on the other hand, contend that, although the transactions were structured to optimize tax treatment, the trusts were independent entities with the power of decision over the purchase of the stock, the sale of assets to Barroso, and the liquidation of the company. Under this Court's holdings in *Pityo v. Commissioner*, 70 T.C. 225 (1978), on appeal (5th Cir., Oct. 17, 1978), and *Rushing v. Commissioner*, 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971), petitioners argue that such a sequence of events does not disqualify the sale from the benefits of section 453. We agree with petitioners.

It is true that Federal tax consequences must be determined by the substance of a transaction rather than by its form. "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). To qualify for section 453, therefore, a transfer of property must be a bona fide installment sale. *Griffiths v.*

---

*   *   *   *   *   *   *

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

    (1) GENERAL RULE.—Income from—

        (A) a sale or other disposition of real property, or

        (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

    (2) LIMITATION.—Paragraph (1) shall apply—

        (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

            (i) there are no payments, or

            (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

*Commissioner*, 308 U.S. 355, 357–358 (1939); *Wrenn v. Commissioner*, 67 T.C. 576, 580 (1976). It does not follow, however, that every time property is sold and then is the subject of subsequent disposition that the initial sale must be ignored for tax purposes. The issue is whether the initial sale has economic substance and this is a factual determination for the trial court. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 456 (1950).

In *Rushing v. Commissioner, supra*, and *Pityo v. Commissioner, supra*, the cases on which petitioner relies, we analyzed the tax implications of the installment sale of stock to trusts created for that purpose and held that the sales involved had economic substance. See also *Roberts v. Commissioner*, 71 T.C. 311 (1978). In *Rushing*, the corporations involved had elected to liquidate under section 337. Thereafter, the shareholders established trusts for the benefit of their children and 5 days later the trusts purchased the shareholders stock. Within a day, the trusts voted for a corporate distribution of the assets to complete the plan of liquidation. We held that the taxpayers qualified for section 453. The sale to the trust had substance since the trustee was "free to void the resolution of liquidation, and, in fact, final implementation and fruition of the plan required an affirmative act on the part of the trustee." *Rushing v. Commissioner*, 52 T.C. at 898.

In its affirming opinion, (441 F.2d at 598), the Fifth Circuit noted that:

a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax. On the other hand, a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom. [Citations omitted.]

The sale in *Rushing* qualified for section 453 since the taxpayers had no control over the trustee or the liquidation proceeds. "The taxpayers' only effective means of obtaining the benefit of the liquidation proceeds was under the contract of sale with the trust a contract which provided for payments to be made on the installment basis." 441 F.2d at 598.

In *Pityo v. Commissioner*, 70 T.C. 225 (1978), we again addressed the issue whether qualification for section 453 could

be achieved if the sale of securities was to a trust created for that purpose. In *Pityo*, the taxpayer sold his stock to a trust created for the benefit of his children rather than selling it on the open market. The trust subsequently sold the major portion of stock and invested the proceeds in mutual funds in accordance with an informal understanding with the taxpayer. The Commissioner argued that the taxpayer constructively received the proceeds since he could have sold the stock himself on the open market. We held that the taxpayer qualified for section 453 since the trust was not a mere conduit or straw party. The trustee had no binding obligation either to the taxpayer or to any ultimate purchaser with respect to disposition of the stock. The informal understanding with the taxpayer was not decisive since the legal responsibility for making the decision was that of the trustee, not the taxpayer.[3] See 70 T.C. at 237–238.

We think the *Rushing* and *Pityo* cases were decided correctly and are precedent controlling the disposition of this case. Here petitioners laid the groundwork for the sale of the company's assets and the subsequent liquidation in much the same way the taxpayers made nonbinding prearrangements in the *Rushing* and *Pityo* cases. This does not alter the determinative fact, however, that the trustee acted in an independent capacity in purchasing the stock and carrying out the asset sale and liquidation of the company. The petitioners controlled the liquidation proceeds neither directly nor indirectly through control of the trustee. At no time after the sale of their stock to the trusts did petitioner actually or constructively receive the liquidation proceeds or the economic benefit therefrom. Instead, the petitioners were limited to their rights under the installment sales contract. Under these circumstances petitioners are eligible for the benefits of installment sale reporting under section 453.

Respondent's reliance on *Griffiths v. Commissioner, supra*, is misplaced. In *Griffiths*, the taxpayer sold stock on the installment method to his wholly owned corporation which then sold the stock for cash to the ultimate purchaser. The Supreme Court held that the taxpayer immediately was taxable on the entire amount since the taxpayer, through his controlled corporation, had actual command over the sales proceeds. Here, on the other

---

[3]We reached the same conclusion on similar facts in *Roberts v. Commissioner*, 71 T.C. 311 (1978).

hand, petitioners have no such control. The trusts are independent entities.

The independent status of the trusts is not negated by limitations on distributions in the installment sales agreements. Contrary to respondent's contentions, the real beneficiaries of the trusts are not petitioners. Although the installment sales agreements impose some limitations on the trustee's ability to make distributions, these limitations are not unduly restrictive. In fact, the terms of the installment sales agreements overall are very favorable to the trusts. The sales price was not greater than fair market value and the interest on the unpaid balance is only 4 percent. The interest and trustee fees are required to be paid out of trust income but it does not follow, as respondent suggests, that no current income will be available for the beneficiaries in any given year. Respondent misinterpreted testimony of a trust officer to conclude that annual trust fees are 6 percent which, when coupled with the 4 percent interest on the unpaid balance, would require annual income of more than 10 percent before beneficiaries could receive a distribution. According to the actual estimates by the trust officer, however, annual trustee fees are less than 0.5 percent for these trusts, not 6 percent.[4] Thus it is not unlikely that the trusts might have net income for distribution annually.

Nor do we think that the benefit to the beneficiaries is nullified by the provision of the installment sales agreements prohibiting invasion of principal for the benefit of beneficiaries unless the remaining principal of the trusts is equal in value to 125 percent of the then remaining unpaid purchase price. Distributions to beneficiaries are possible at the trustee's discretion if that requirement is satisfied. Moreover, the appreciation in the value of principal would ultimately be to the beneficiaries' benefit upon the termination of the trust and this appears to be the primary objective. The investment goal of the trusts is to accumulate capital so that after the installment obligations to petitioners have been paid in full the trusts will be left with an aggregate capital account in excess of the amount of the original installment liability. Restriction on distributions of principal while the installment obligations are still outstand-

---

[4]The trust officer estimated that the charge would be $6 a thousand for the first $150,000 and in the aggregate $8,000 to $8,500 on a $2 million trust. This is 0.4 to 0.425 percent, not the 6-percent figure used by respondent.

ing in no way interferes with this objective and does not require the conclusion that the true beneficiaries of the trust are petitioners.

The bank, as trustee, did not purchase the company stock solely to enable petitioners to obtain favorable tax consequences. The trust beneficiaries here received material benefits. See and compare *Wrenn v. Commissioner*, 67 T.C. 576, 583–584 (1976). Nor do we think the restrictions on distribution make the arrangement equivalent to an escrow agreement. Petitioners have no control over the type of investments made by the trust, no cash collateral, and no assurances that the investment experience of the trusts will not impair petitioners' ability to collect future amounts due. See and compare *Lustgarten v. Commissioner*, 71 T.C. 303 (1978); *Pozzi v. Commissioner*, 49 T.C. 119 (1967). The installment sale to the trust was bona fide.

Respondent also points to *Allen v. Commissioner*, 66 T.C. 340 (1976), in which we held that a donor was taxable on gain attributable to liquidation proceeds in a corporation when stock had been transferred to a charity even though the charity had the power to rescind the liquidation. We held that control over the liquidation is only one factor to be considered and adopted the position of the Sixth Circuit in *Jones v. United States*, 531 F.2d 1343, 1345 (6th Cir. 1976), that "the 'realities and substance' of the events and not hypothetical possibilities should govern." 66 T.C. at 346–348. See also *Kinsey v. Commissioner*, 477 F.2d 1058 (2d Cir. 1973); *Hudspeth v. Commissioner*, 471 F.2d 275 (8th Cir. 1972). We find those cases distinguishable, however, since they dealt with anticipatory assignment of income rather than actual or constructive receipt of sales proceeds. Here the issue is not whether petitioners are taxable on the proceeds, it is only when they are taxed that is disputed. See *Rushing v. Commissioner, supra* at 896.

Moreover, the control in the charitable gift cases concerned only the legal control of the charity over the liquidation. The issue of control in the section 453 cases is centered more on the taxpayer's control of or economic benefit from the proceeds of liquidation. The trusts' legal control over the liquidation is important in the section 453 cases primarily as one indication of whether the grantor has such control over or economic benefit from the liquidation proceeds. Thus, although both the trust's control over the liquidation and the grantor's control over the

trust may be material factors, the grantor's control over the initial recipient of the stock—the trust as purchaser—has a much greater significance. This type of control may be determinative, apart from any control by the trust over a subsequent liquidation, of whether a sale has economic substance.

Thus, from the perspective of the appropriate legal issues, a bona fide sale to an independent trust contrasts sharply with a gift of corporate stock to charity even if the recipients' legal powers over a pending dissolution of the corporation are identical. Respondent's attempts to equate the two here appear to be premised on his belief that, under the terms of the sales agreements, constraints on the trusts gave petitioners effective control over the proceeds. As discussed above, however, respondent's belief is based on a misinterpretation of the facts and an evaluation of the transaction with which we disagree.

We do agree with respondent that the realities and substance of the events, rather than formalities, should govern in determining whether an installment sales contract is bona fide, but we think that the transactions here as well as those in *Rushing* and *Pityo* had economic substance. In substance as well as form, there was an installment sale by petitioners to the trusts. After the transfer of the stock to the trusts, the petitioners' recourse was limited to recovery as provided in the installment sales agreements. "From an economic standpoint the trusts, unlike a mere conduit or straw party, had significant potential benefits and risks from the transaction." See *Pityo v. Commissioner, supra* at 237. Petitioners had neither the control of nor the economic benefit from the liquidation proceeds.

Accordingly, we conclude that petitioners did not actually or constructively receive 100 percent of the sales price in the year of the sale. We hold that petitioners are entitled to utilize the installment method under section 453 for reporting the gain on the sale of their company stock to the trusts. To reflect other adjustments,

*Decisions will be entered under Rule 155.*