STANLEY E. WILSON and CHRISTINE WILSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Wilson v. Commissioner
Docket No. 6483-76.
United States Tax Court
T.C. Memo 1980-288; 1980 Tax Ct. Memo LEXIS 291; 40 T.C.M. (CCH) 835; T.C.M. (RIA) 80288; August 4, 1980, Filed Allan Howeth and Kirk R. Manning, for the petitioners. H. Steven New, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal *292 income tax for the taxable years 1972 and 1973 in the respective amounts of $58,571.45 and $1,194.07. Due to concessions of the parties, the sole issue for our decision is whether petitioners are entitled to utilize the installment method under section 453, Internal Revenue Code of 1954, [1] in reporting gain from the sale to an irrevocable trust established for the benefit of their children of stock in a corporation being liquidated. At the trial of the instant case respondent relied upon the anticipatory assignment of income theory. However, for the first time in his opening brief respondent set forth new theories of constructive receipt at the time of the sale of stock to the trust and the "substance and realities" of petitioners' sale. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and accompanying exhibits are incorporated herein. Stanley E. Wilson and his wife, Christine Wilson (herein petitioners), who timely filed their joint Federal income tax returns for the taxable years 1972 and 1973 with the Internal Revenue Service *293 Center at Austin, Texas, resided at Fort Worth, Texas, at the time they filed their petition in this proceeding. Mr. Wilson was an employee of radio station KFJZ, Fort Worth, Texas for several years when, in 1965, Texas State Network, Inc. (TSN) purchased the radio station. [2] Following the purchase of the radio station, Mr. Wilson became president of TSN, general manager of the station, and an owner of 10 percent of the outstanding stock of TSN. As president of TSN, Mr. Wilson controlled most of its day-to-day operations but did not make overall policy decisions and did not dictate policy on corporate matters. Mr. Arnold Malkan, who owned 73.2 percent of all outstanding TSN stock, and was chairman of the board of directors, was responsible for such matters. On June 10, 1971, the board of directors of TSN unanimously agreed to recommend to the shareholders that they adopt a plan for the complete liquidation and dissolution of TSN under the provisions of section 337. In addition, the board authorized the corporate officers to execute an Agreement for Sale and Purchase of Assets whereby TSN and its subsidiaries *294 agreed to sell substantially all of their assets to Communications, Inc. of Austin, Texas (herein Communications). On December 22, 1971, the board adopted a plan of complete liquidation and authorized TSN officers to consummate the sale of assets to Communications as set forth in the provisions of the agreement of June 10, 1971. In January 1972 petitioners contacted their attorney for the purpose of investigating the feasibility of establishing a trust for the benefit of their three children and selling their TSN stock to the trust. [3] Following this meeting, petitioners' attorney contacted the Fort Worth National Bank trust department to discuss a trust agreement in which the bank would act as trustee. Petitioners' attorney also informed the bank that TSN was in the process of liquidation and proposed that petitioners sell all of their TSN stock to the trust for approximately $50,000 cash and $250,000 in notes, payable over a 10-year period. Negotiations between the bank and petitioners' attorney followed which involved the bank's decision to become trustee, revisions to the proposed trust agreement, and suggested types of investments to be utilized by the trust. *295 On February 26, 1972, the shareholers of TSN approved the plan of complete liquidation and authorized the officers and directors to sell TSN assets, pursuant to the plan. By November 1972 TSN had completed the sale of substantially all of its assets. [4]
On December 5, 1972, Mr. Malkan, as chairman of the board of directors, reported that the initial distribution in liquidation had been delayed by stock transfer agent requirements and requested the board of directors to authorize the transfer of stock owned by TSN to the TSN shareholders. The board of directors approved a resolution which authorized the secretary of TSN to direct the transfer agents to transfer the said shares to the shareholders of TSN.
Petitioners completed their negotiations with the bank and on December 6, 1972 created an irrevocable trust for the benefit of their children. The bank agreed to act as trustee.Under the trust agreement petitioners held the right to appoint any successor trustee provided that they appoint another *296 bank having capital and surplus of at least $10,000,000 and in which they did not have a substantial interest either through stock ownership or otherwise. Contemporaneously, petitioners entered into an installment sale contract with the bank as trustee. Under the contract petitioners sold all of their stock in TSN (70,000 shares) to the trust for $300,000, payable $25,000 in cash prior to December 31, 1972, $25,000 in cash payable on January 15, 1973 and the remaining $250,000 covered by a 10-year promissory note payable in nine annual installments commencing January 15, 1974, of $20,000 each and a final installment of $50,000. At this time the bank was aware that the sale of TSN assets was completed and that the liquidation proceeds attributable to the shares it purchased from petitioners would soon be distributed to the bank as trustee. Following the execution of the installment agreement, petitioners delivered a stock certificate representing 70,000 shares of TSN stock to the trustee. On December 8, 1972, the bnak took the necessary measures to have the stock reissued in its name as trustee. From this date the bank was the record holder of the stock and operated independently *297 and beyond the control of petitioners. The board of directors of TSN approved the first liquidating distribution on December 15, 1972. Petitioners' attorney notified the bank on December 20, 1972, that there had been a mistake in the valuation of the shares of stock in Dee Williams Manufacturing Corporation, an asset held by TSN which was to be distributed pursuant to the liquidation. Both the bank and petitioners assumed that this stock had a higher value than, in fact, it had. Consequently, the terms of the installment agreement and the promissory note were redrafted by changing the purchase price from $300,000 to $270,000 based upon a mutual mistake of fact. [5] On December 20, 1972, TSN delivered to the trustee its allocable share of the initial liquidating distribution having a value of $266,000, consisting of cash and a promissory note. *298 On their joint Federal income tax return for the taxable year 1972 petitioners reported the sale of their TSN stock to the trust under the installment method provided in section 453. Consistent with this approach petitioners reported that portion ($12,037) received in 1972 pursuant to the installment agreement as long-term capital gain. The Commissioner, in his statutory notice of deficiency, made the following determination: (a) It is determined that long-term capital gain attributed to a 1972 disposition of 70,000 shares of Texas State Network stock is taxable in the amount of $128,000.02 as shown below instead of $12,037.00 reported on the return because (1) it has not been established that stock rather than liquidating proceeds was disposed of in 1972, and (2) it has not been established that you are entitled to report the transaction on the installment basis. Taxable income for 1972 is increased by the difference of $115,963.02. Liquidating distribution TSN stock
$270,000.05
Less: Miscellaneous item not received
4,000.00
Net amount received
$266,000.05
Less: Basis of stock
10,000.00
Gain realized
$256,000.05
Less: Section 1202 deduction
128,000.03
Taxable capital gain as revised
$128,000.02
*299 OPINION The issue for our decision is whether petitioners are entitled to report the gain from the sale of their stock in a liquidating corporation under the installment method. Mr. Stanley E. Wilson was an employee of radio station KFJZ Fort Worth, Texas for several years prior to the time Texas State Network, Inc. (herein TSN) purchased the radio station in 1965. After the radio station was purchased Mr. Wilson acquired 10 percent of all outstanding stock of TSN. In addition, Mr. Wilson became president of TSN as well as general manager of the radio station. At a meeting held on June 10, 1971, the board of directors of TSN adopted a resolution recommending to the TSN shareholders that a plan of complete liquidation under section 337 be adopted. On December 22, 1971 the plan of liquidation was adopted calling for the sale of substantially all TSN assets and the distribution of the proceeds to TSN shareholders. In January 1972, Mr. Wilson and his wife (herein petitioners) contacted their attorney for the purpose of exploring the possibility of establishing a trust for the benefit of their three children and selling their TSN stock to the trust under the installment method *300 set forth in section 453. Petitioners' attorney notified the First National Bank, Fort Worth, Texas, and proposed the creation of a trust for petitioners' children with the bank as trustee. Negotiations followed which related to specific aspects of implementing the trust. On February 26, 1972, the shareholders of TSN approved the plan of complete liquidation and authorized TSN to sell its assets. By November 1972 TSN had completed the sale of substantially all of its assets. Remaining assets were stocks in various corporations owned by TSN which TSN intended to distribute in kind upon final liquidation. TSN also set aside a portion of the proceeds from the sale of their assets in order to meet contingent liabilities. On December 6, 1972, petitioners and the bank, in its capacity as trustee, entered into a written agreement which established the trust for petitioners' children. In conjunction with this agreement, petitioners and the bank executed an installment sale contract whereby petitioners sold their TSN stock to the trust. The installment contract provided for payments by the trust over a 10-year period with a total purchase price of $300,000. [6] At this time the *301 bank was aware of TSN activities relating to its plan of complete liquidation. Petitioners delivered their stock certificates to the bank on December 8, 1972 and the bank immediately had the TSN stock issued in its name as trustee. On December 15, 1972 the board of directors authorized the initial distribution in liquidation and the trustee as a shareholder, on December 20, 1972, received its allocable share which had a value of $266,000. Respondent contends that petitioners are not entitled to utilize the provisins of section 453 in the sale of their stock to the trust. Respondent argues that, considering the "substance and realities" of petitioners' sale of stock, the transaction lacked economic substance. Accordingly, respondent suggests three alternate characterizations of this transaction: (1) the sale of corporate assets by TSN, followed by the distribution of the proceeds to petitioners, and the sale of the proceeds to the trust by petitioners; (2) the trustee should be considered an agent or escrow holder *302 for petitioners and receipt of the liquidation proceeds by the trustee is receipt by petitioners; or (3) petitioners had constructive receipt of the liquidation proceeds prior to their sale of TSN stock to the trust. In his opening statement at the trial of this case, counsel for respondent unequivocally informed the Court and counsel for petitioners that his position was based upon an anticipatory assignment of income theory. In addition, counsel for respondent informed the Court that the facts in the instant case were distinguishable from those in Rushing v. Commissioner, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969), a case relied upon by petitioners. For the first time in his opening brief respondent asserted that the "substance and realities" of the transaction regarding petitioners' stock sale demonstrated that petitioners attempted to defer their gain from such sale while incurring no real economic risk by accepting installment payments from the trust. On reply brief petitioners contend that respondent's "substance and realities" theory constitutes undue surprise and places them in a disadvantaged posture. Petitioners, relying *303 upon Riss v. Commissioner, 57 T.C. 469 (1971), affd. sub nom. Commissioner v. TransportManufacturing & Equipment Co., 478 F.2d 731 (8th Cir. 1973), urge that respondent should be precluded from raising a theory for the first time in his opening brief. We agree with petitioners. In Riss, respondent for the first time on brief relied upon section 482. We held at page 474 of 57 T.C.: Our inherent authority is to decide cases upon issues properly before us. This case may well have presented opportunities for applying section 482 or some theory within the assignment-of-income area; however, these opportunities were lost when respondent failed to inform petitioner either in the statutory notice, in his answer, or at trial of his intended theory for sustaining the deficiency. Accordingly, we modify our prior opinion and hold that petitioner realized none of the gain from the sale of the truck trailers.
In affirming the Court of Appeals held at page 736 of 478 F.2d: Although the most appropriate times to advise the taxpayer of the Commissioner's theories to sustain an assessment would be first in the notice of deficiency and then in the *304 Commissioner's answer, we do not hold that the Commissioner necessarily loses his right to pursue a theory or Code section that is not specifically raised before or at trial.The basic consideration is whether the taxpayer is surprised and disadvantaged when the Commissioner has failed to plead section 482. Commissioner v. Chelsea Products, supra at 197 F.2d 624; Nat Harrison Associates, Inc., supra 42 T.C. at 617; Burrell Groves, Inc. 16 T.C. 1163, 1169 (1951). However, the longer the Commissioner delays in not expressly advising the taxpayer of the intended theories, the more reason there is to conclude that the taxpayer has not received fair notice and has been substantially prejudiced so as to deny the Commissioner consideration of theories raised for the first tie in post trial briefs. * * * The arguments relating to the "substance and realities" theory, i.e., no risk incurred by petitioners upon the sale of their stock, constitutes a new theory, see Stiles v. Commissioner, 69 T.C. 558 (1978), and under such theory *305 petitioners, who proceeded at trial by relying upon respondent's assignment of income theory, would be required to produce additional evidence in order to establish that they were not assured of receiving all of the payments at the time of the sale. To allow respondent to rely on this new theory obviously places petitioners at a disadvantage. Cf. Schuster's Express, Inc. v. Commissioner, 562 F.2d 39 (2d Cir. 1977), affg. per curiam 66 T.C. 588 (1976). Likewise, respondent's argument that the stock sale, in reality, was made solely for the purpose of minimizing taxes cannot be raised for the first time on brief because it also places petitioners at a disadvantage. In order for petitioners to effectively respond to this theory, they would be required to show their reasons for the creation of the irrevocable trust and the sale of their stock to the trust. The trial having concluded, petitioners are unfairly prevented from rebutting this theory which is beyond the scope and independent of an assignment of income theory.Finally, respondent's theory that petitioners were in constructive receipt of the liquidation proceeds prior to the sale of their *306 stock will not be considered when raised for the first time on brief. Respondent, in arguing this theory, contends that the liquidation process had so ripened and matured by the time petitioners sold their stock to the trust that they were in constructive receipt of the liquidation proceeds and were, therefore, taxable in the year of constructive receipt. In arguing this theory respondent relies upon a line of cases which involve gifts of stock in a liquidating corporation to charity. See Jones v. United states, 531 F.2d 1343 (6th Cir. 1976); Kinsey v. Commissioner, 477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972); Hudspeth v. United States, 471 F.2d 275 (8th Cir. 1972); and Allen v. Commissioner, 66 T.C. 340 (1976). Here again, this theory would require petitioners to establish that the liquidation process had not reached an irretrievable state in order to demonstrate that they did not have an unfettered right to the liquidation proceeds. The stipulation of facts and the evidence produced during the trial gave some indication that problems existed at the time petitioners sold their stock *307 to the trust which threatened the plan of liquidation. Petitioners, in their requested findings of fact, suggested that problems existed which threatened the completion of the liquidation but respondent objected, basing his objection on the fact that no one testified who could establish the fact that the plan of liquidation was threatened. Respondent cannot have it both ways. Since he failed to put petitioners on notice of his reliance on the constructive receipt theory applicable to the time petitioners sold their stock he cannot now argue that petitioners have failed to negate the presence of constructive receipt at the time of the stock sale. Moreover, the above cases upon which respondent relies involved the question of whether the taxpayers were taxable on the gain resulting from the liquidation of the respective corporations whereas the instant case involves the question of whether petitioners can utilize the installment method of reporting gain. See Weaver v. Commissioner, 71 T.C. 443 (1978). In response to respondent's theory, i.e., anticipatory assignment of income, asserted at trial, petitioners rely upon Rushing v. Commissioner, 441 F.2d 593 (1971), *308 affg. 52 T.C. 888 (1969), and contend that the facts in the instant case are substantially indistinguishable from those in Rushing. [7] In Rushing two individuals each owned 50 percent of the stock in two corporations. Both corporations adopted a plan of complete liquidation under section 337. Following the adoption of the plan, the corporations sold substantially all of their assets. Immediately before the expiration of the 12-month liquidation period specified in section 337, both individual shareholders created irrevocable trusts for the benefit of their children and sold their corporate stocks in installment sales to the trusts. After the sales of the stock to the trusts were consummated, the trustee as sold shareholder of the corporations liquidated the corporations and received the liquidation proceeds. Respondent, in Rushing v. Commissioner, supra, argued that the sale of the stock to the trusts constituted an anticipatory assignment of income and, therefore, the taxpayers were not entitled to utilize the provisions of section 453. In deciding Rushing the Court of Appeals for the Fifth Circuit first set forth what the case *309 did not involve: At the outset we feel compelled to state what this case is not about. In the first place, there is no attempt here to change the character of the gain involved and convert what would be ordinary income into capital gain. The gain realized by the taxpayers on the liquidation of the corporations, whether derived through sale on the installment basis to the trust or directly from the liquidation proceeds, would be entitled to capital gains treatment. Secondly, this is not a case where one taxpayer has attempted to shift the gain to a second taxable entity in order to reap the benefits of the second entity's lower tax rate. The price the trusts paid the taxpayers *310 for the stock was the full value of the stock, including the appreciation in value which would be realized upon liquidation. * * * [441 F.2d at 597.] Accordingly, the Court rejected respondent's reliance upon the anticipatory assignment of income theory because no income was assigned. The facts in the instant case clearly demonstrate what this case is not about, as in Rushing. Petitioners did not assign any income as a result of the installment sale agreement they made with the trustee. After holding that respondent's theory of anticipatory assignment of income did not apply, the Court went on to decide whether the interjection of the trusts insulated the taxpayers from constructive receipt of the liquidation proceeds at the time the trusts received the liquidation proceeds from the corporations. We hasten to point out that our discussion of constructive receipt at this juncture is different from our earlier discussion herein where we held that respondent is precluded from asserting the constructive receipt theory for the first time on brief. That discussion involved respondent's argument that petitioners were in constructive receipt of the liquidation *311 proceeds prior to the time they sold their stock to the trust and involved critical facts which were not addressed in Rushing. In Weaver v. Commissioner, supra, we stated that the issue of control in questions relating to section 453 is centered more on petitioners' receipt of an economic benefit from the liquidation proceeds. See also Roberts v. Commissioner, 71 T.C. 311 (1978) and Lustgarten v. Commissioner, 71 T.C. 303 (1978). In Rushing v. Commissioner, supra, the question was whether the taxpayers were in constructive receipt of the liquidation proceeds at the time the trusts liquidated the corporations and received the proceeds, not at the time the taxpayers sold their stock to the trusts. However, since petitioners rely upon Rushing they recognize the potential application of constructive receipt theory at the time of liquidation and distribution to the trustee. Accordingly, the critical question presented is whether the trustee was under the control of petitioners to such an extent at that time that petitioners constructively received the proceeds when distributed to the trustee. *312 Weaver v. Commissioner, supra.In Rushing, the court held that the trusts created by the taxpayer were autonomous entities which controlled the proceeds and no right of recapture inured to the benefit of the taxpayers, and that the taxpayers retained no effective benefit or control over the liquidation dividend after the sale of their stock to the trusts. Rushing v. Commissioner, supra, at 598. Petitioners take the position that the bank was an independent entity whose obligation was to protect the interests of the trust beneficiaries, the children of petitioners. The facts confirm their position. Petitioners established irrevocable trusts for the benefit of their children. While they retained the right to appoint a successor trustee, this right was limited to appointing another bank in which they did not have any substantial interest. The bank was independent of petitioners' control and was responsible to petitioners' children, the beneficiaries under the trust agreement.Moreover, respondent concedes that the bank was independent of petitioners' control. [8] Accordingly, petitioners obtain the benefits of the liquidation proceeds *313 only under the installment sales contract which provide for installment payments. The facts here are virtually indistinguishable from those in Rushing and, therefore, we hold that petitioners are entitled to utilize the provisions of section 453 with respect to reporting the gain from the sale of their TSN stock in the taxable year 1972. In so doing we again reaffirm the correctness of Rushing and note that the instant case is appealable to the appellate court which decided Rushing, i.e., the United States Court of Appeals for the Fifth Circuit. Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. TSN was organized and incorporated under the laws of Texas.↩
3. As of July 1972 and at all pertinent times thereafter, petitioners owned seven percent of all outstanding TSN stock.↩
4. TSN retained shares of stock it held in various corporations and contemplated that these shares would be distributed in kind to the shareholders as a liquidation distribution.↩
5. In negotiating the price finally paid by the bank for petitioners' TSN stock, petitioners and the bank based $266,000 of the purchase price on the value of the cash, notes, and shares of various stock held by TSN to be received as a liquidating distribution, with $4,000 being allocated to contingent claims owed to TSN, after deducting outstanding liabilities of TSN.↩
6. On December 20, 1972 petitioners and the bank agreed to change the purchase price of the TSN stock from $300,000 to $270,000 due to a mutual mistake of fact.↩
7. Most recently we have confirmed our position in Rushing v. Commissioner, 441 F.2d 593 (1971), affg. 52 T.C. 888 (1969); Weaver v. Commissioner, 71 T.C. 443 (1978); Roberts v. Commissioner, 71 T.C. 311 (1978); Lustgarten v. Commissioner, 71 T.C. 303 (1978), on appeal (5th Cir., Apr. 30, 1979); and Pityo v. Commissioner, 70 T.C. 225 (1978); Goodman v. Commissioner↩, 74 T.C.     (Jul. 16, 1980).
8. It is curious to us that respondent, on opening brief, argues that the bank acted as a mere agent of petitioners while in his reply brief makes no objection to petitioners requested finding of fact to the contrary. Due to his failure to object we find this fact as requested by petitioners.↩